UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.

<u>Michael Francis</u>

Case No. 1:21-cr-153-1-SM
Opinion No. 2023 DNH 126

**O R D E R**

Michael Francis has been indicted on three counts of conspiracy to, and possession with intent to, distribute cocaine, fentanyl, and methamphetamine, as well as two firearms charges.  Francis moves to suppress (1) evidence obtained in the search of his vehicle; and (2) evidence obtained during his arrest on September 1, 2021.[1]  In his motion to suppress evidence obtained during the search of his vehicle, Francis challenges the veracity of statements made in the affidavit in support of

---

[1]    In addition, defendant also moves to suppress the introduction of evidence gathered by law enforcement during a search of his apartment on September 2, 2021.  The government has agreed that it will not seek to introduce such evidence at trial, will move to dismiss Counts 3, 4, and 5 of the indictment (all of which are based on evidence seized from the apartment), and asks the court to deny the motion as moot.

Finally, defendant moves to suppress statements he made on September 7, 2021.  <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981).  The government agrees that it will not use those statements at trial, and asks the court to deny the motion as moot.

the warrant, arguing for a hearing under <u>Franks v. Delaware</u>, 438
U.S. 154, 155 (1978).

Over the government's objections, the court held a combined
<u>Franks</u> and suppression hearing on June 14, 2023, and July 12,
2023.  Having considered the evidence presented at the hearing,
as well as the motions, and the parties' supporting memoranda,
both motions to suppress are denied.

**Factual Background**

Michael Francis is alleged to be a member of the Gangster
Disciples criminal street gang.  At the time of the events
relevant to this prosecution, he was an active state parolee.
The conditions of his parole required Francis to agree to
searches of his person, property, and possessions, as requested
by a parole officer; that he would obtain his parole officer's
permission before changing residences; and that he would not
associate with other parolees.

1.   <u>Cooperating Witness ("CW")</u>

A cooperating witness ("CW") provided information to law
enforcement officers during a post-arrest interview regarding
Francis's alleged criminal activity.  The witness had been
arrested on warrants relating to two prior motor vehicle stops

(on June 13, 2021, and July 30, 2021), both of which led to the seizure of a large amount of drugs.  During his August 19, 2021, interview, the CW admitted to possessing the drugs seized during the June and July motor vehicle stops, and admitted that he intended to distribute those drugs.  He also provided significant information about his drug suppliers.

The CW reported that the drugs seized during the June 13 stop were provided to him by Ryan Call, a member of the Gangster Disciples whom the CW had met in prison, and with whom he had maintained a relationship.  The CW said that Call informed him that the drugs came from Michael Francis, another Gangster Disciples member.  After Call was arrested in the early part of July, 2021, the CW said he was contacted by Francis, who told the CW that he, Francis, would be his supplier going forward. The drugs recovered during the July 30 motor vehicle stop had been provided by Francis, said the CW.

In his post-arrest interview, the CW detailed the price and quantity of drugs he received regularly from Francis, and described the locations where those drug transactions took place. One location, according to the CW, was near Rimmon Street and Putnam Street, in Manchester, close to where the witness believed Francis lived.  The CW said that Francis met with him

personally to conduct the transactions.  He described in detail the vehicle Francis drove (a Honda Accord), and reported that Francis routinely kept a pistol between the driver's seat and center console of the vehicle.

### 2.   Law Enforcement Corroboration of CW's Information

Following their interview with the CW, law enforcement officers corroborated that Ryan Call (the CW's initial supplier) had been arrested in early July, 2021, and remained incarcerated at the time of the August interview.  Officers also conducted a records check of vehicles registered to Francis, which confirmed that Francis's car matched the Honda Accord described by the CW, and Francis's parole officer confirmed that he regularly used that vehicle.[2]

In addition, using a law enforcement database, investigators corroborated that Francis resided at 231 Thornton Street, in Manchester,[3] close to where the CI said his drug transactions with Francis were conducted.  On August 20, 2021,

---

[2]   The vehicle was registered to 73 Schiller St., Apt. 2, in Manchester, which was the address that Francis had given to his parole officer as his residence.

[3]   Francis had not reported this address to his parole officer as his current residence.

officers set up a surveillance operation at 231 Thornton Steet.
They observed a person in the rear parking lot of the residence,
next to a Honda Accord.  Based on his physical characteristics,
that person appeared to be Michael Francis.  Subsequent
surveillance conducted at 231 Thornton Street resulted in
further observations of Francis and/or the Honda Accord.

Finally, investigators determined that Francis was a
convicted felon, federally prohibited from possessing any type
of firearm.

### 3.   Warrant to Search Vehicle

On August 25, 2021, FBI Special Agent Ryan Burke applied
for a warrant to search the Honda Accord.  That application was
based primarily on information obtained from the CW, as well as
law enforcement's corroboration of that information.  The
affidavit in support of the warrant was signed by Burke.

A search warrant was issued by the magistrate judge on
August 25, 2021.  She found probable cause to believe that a
search of Francis's car would result in evidence of criminal
activity.  The warrant was executed on September 1, 2021.

4.   <u>September 1, 2021, Arrest</u>

On September 1, 2021, law enforcement agents again conducted surveillance of the Thornton Street apartment (where Francis's car was parked in the rear).  They observed Francis leaving the apartment, enter the Honda Accord, and drive away. Armed with the search warrant, the officers followed.  Francis drove to a residence on Joliette Street, in Manchester.  There, Francis met a man identified by the police as Emilio Flores, an associate of Francis's, a suspected drug dealer, and a state parolee.[4]   Flores had an outstanding warrant for his arrest on a 2018 parole violation.

Flores went inside the building, and came back out holding a bag that he put in the backseat of Francis's car.  He got into the car's passenger seat, and they drove away.  While following Francis and Flores, law enforcement officers contacted Francis's parole officer.  They notified him of the surveillance conducted at Francis's Thornton Street residence, that Francis was associating with Flores, and that Flores had brought a bag into Francis's vehicle.

---

[4]   As mentioned, as a parolee, Francis's parole conditions prohibited his association with other parolees.

Francis and Flores drove to TD Bank.  Francis got out of the car and went inside (Flores remained in the car).  Officers then executed the search warrant, searching Francis's car. Simultaneously, Francis was placed under arrest while still inside the bank, for violating the conditions of his parole. Flores was arrested as well.

The initial search of the car revealed a firearm holster under the driver's seat, and a kilogram of cocaine.  A subsequent search yielded two cell phones (belonging to Flores), $10,000 in cash, and a black bandana purported to be gang paraphernalia.

Francis's cell phone was sitting on a bank counter when he was arrested.  That phone was seized, incident to his arrest. Francis was later questioned by two Manchester police officers. A recording of that interview is in evidence.  Finally, a warrant to search the contents of Francis's cell phone was obtained and executed (21-mj-277-AJ).  That search yielded evidence of drug distribution activity.

**Motion to Suppress Evidence Seized from the Vehicle**

Francis argues that the search of his car was not supported by probable cause.  That is because, he says, the affidavit in support of the search warrant failed to disclose to the issuing magistrate judge that (1) the confidential informant had a prior conviction for falsifying physical evidence; and (2) law enforcement officers had noted in their reports regarding the CW's July 30, 2021, arrest that he had been dishonest during the encounter.  Had that information been disclosed, Francis argues, the warrant to search his vehicle would not have issued, since a reformed affidavit including that information would not be enough to establish probable cause.[5]

Francis first contends that the affidavit relies almost entirely on the CW's word alone.  The corroboration provided by law enforcement was insufficient, Francis says, because it failed to corroborate any actual criminal conduct.  And, Francis says, the affidavit lacks any discussion of the CW's credibility, or whether the CW had provided reliable information to law enforcement in the past.  Given those deficiencies,

---

[5]   Francis also makes the argument that the affidavit is facially insufficient to establish probable cause.  For the reasons discussed at the evidentiary hearing, that argument is unpersuasive.

Francis argues, the magistrate judge's assessment of probable
cause would have been negatively impacted by information
concerning the CW's past conviction for falsification of
physical evidence, as well as the CW's dishonesty during the
July 31 motor vehicle stop, and a warrant would not have issued.
Francis argues the affiant's failure to include that relevant
information at least constitutes a "reckless disregard for the
truth."

"Probable cause for a search exists where there is a fair
probability that evidence of a crime will be found in a
particular place." U.S. v. Maglio, 21 F.4th 179, 185 (1st Cir.
2021) (citations omitted) (cleaned up).  "For a warrant to be
voided and the fruits of a search excluded, the defendant must:
(1) show that the affiant in fact made a false statement or
omission 'knowingly and intentionally, or with reckless
disregard for the truth," (2) make this showing by a
preponderance of the evidence, and (3) show that, with the
recklessly omitted information added to the affidavit, the
reformed affidavit fails to establish probable cause.'" U.S. v.
Gifford, 727 F.3d 92, 98-99 (1st Cir. 2013) (quoting U.S. v.
Tzannos, 460 F.3d 128, 136 (1st Cir. 2006)).

"An allegation is made with reckless disregard for the truth if the affiant in fact entertained serious doubts as to the truth of the allegations or where circumstances evinced obvious reasons to doubt the veracity of the allegations in the application." Gifford, 727 F.3d at 98-99. (internal quotation and citations omitted). "In the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." Id. at 99 (quotation omitted). "Negligent omissions — even negligent omissions of highly probative information — do not satisfy this strict standard." U.S. v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015) (citing Franks, 438 U.S. at 171) (further citations omitted).

The court fully credits Special Agent Ryan's testimony – there was no intent to omit material information nor any purpose to deceive.  Best practices might counsel including the omitted information, but failure to include it did not undermine the magistrate judge's assessment.  And, the affidavit, even if reformed to include the omitted facts, still establishes probable cause supporting issuance of the warrant.  Neither the CW's prior criminal conviction, nor the CW's dishonesty as described in the July 30 police report are sufficient to undermine the probable cause finding.

As the Court of Appeals for the First Circuit instructed in U.S. v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011), when an affidavit in support of a warrant application relies primarily on a witness's report to law enforcement, courts should:

> apply a nonexhaustive list of factors to examine the affidavit's probable cause showing.  These factors include, among others, (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect firsthand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

(internal quotations and citations omitted) (cleaned up).  Agent Burke's affidavit adequately satisfies those factors and establishes probable cause to search, even when the omitted information is included.

First, the affidavit sufficiently establishes the probable veracity of the CW.  The CW is identified by name, and he plainly implicates himself in the offenses described, in a manner consistent with the evidence found.  See Tanguay, 787 F.32d at 50 ("informant's trustworthiness may be enhanced in a number of ways, including his willingness to reveal his

identity, the level of detail in his account, the basis of his
knowledge, and the extent to which his statements are against
his interest.").  Special Agent Burke credibly testified that,
when assessing the CW's credibility, he took those circumstances
into consideration, as well as the fact that the CW was
providing information while in custody.  Burke testified that
he:

> . . . recognized that [the CW] was facing significant
> exposure. [The CW] knew his criminal history, that it
> would result in you know a lengthy prison sentence and
> so it's not something he probably wanted to do and
> decided the only way to potentially receive
> consideration is to provide truthful information to us
> that we could then verify. Otherwise, obviously, if he
> provided fake information to us, that could just
> backfire. So I believe that motivated him to provide
> accurate information so that he could eventually,
> hopefully, receive some type of compensation or
> benefit.

See United States v. Batista, 31 F.4th 820, 823–24 (1st Cir.
2022).  ("As we recognized in United States v. Vongkaysone, when
an informant 'has been caught dealing in drugs, it is to his
advantage to produce accurate information to the police so as to
qualify for the leniency he seeks.' 434 F.3d 68, 74 (1st Cir.
2006).  . . . An informant's credibility is further bolstered
when the informant incriminates himself, as the CW here did in
revealing his history of purchasing drugs for resale from
[defendant].") (internal citations omitted) (cleaned up).  See

<u>also</u> <u>U.S. v. Austin</u>, 991 F.3d 51, 56 (1st Cir. 2021) ("When a self-incriminating statement is provided by an informant whose identity is known to the authorities, the statement is more likely to be true because of the risk inherent in making such a statement.") (internal quotations and citations omitted).

The information provided by the CW was detailed and comprehensive.  Specifically, the CW provided information relating to the make, model and identifying details of defendant's car, the location of the reported drug deals, how his meet-ups with Francis were arranged, where Francis would store drugs to be exchanged at the meet-ups, the nearby location of the defendant's residence, the amounts of drugs the CW purchased from Francis, and the prices at which the drugs were purchased.  That level of detail (all of which is set out in the affidavit) further strengthens the CW's credibility, making his first-hand knowledge plausible.  <u>See</u> <u>U.S. v. Greenburg</u>, 410 F.3d 63, 67 (1st Cir. 2005) ("A specific, first-hand account of possible criminal activity is a hallmark of a credible tip.")

Second, law enforcement corroborated several aspects of the information provided by the CW, as could be done practically. Law enforcement officers corroborated that:

- Francis resided near the intersection where the reported drug deals with the CW occurred (an address he had not shared with his parole officer);

- Francis drove a Honda Accord matching the detailed description provided by the CW, including the color, license plate, and a description of the vehicle's rims (corroborated with Francis's parole officer and through on-site surveillance);

- The CW's former drug supplier, Ryan Call (familiar to law enforcement as a member of the Gangster Disciples) had indeed been arrested in early July, 2021, as the CW stated;

- The CW's description of the amount of drugs he regularly purchased from Francis was consistent with the amount of drugs seized from the CW's vehicles;

- The prices paid by the CW for the drugs were consistent with rates known to law enforcement at that time; and

- Francis was a convicted felon.

As the Supreme Court has noted, "[b]ecause an informant is right about some things, he is more probably right about other facts, — including the claim regarding  . . . illegal activity." Illinois v. Gates, 462 U.S. 213, 244 (1983) (internal quotation omitted).  Defendant criticizes law enforcement for not corroborating the CW's reports of criminal activity, but such corroboration is not necessarily required: "It is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a substantial basis for

crediting the hearsay." Id. at 244-45 (internal quotations and citations omitted). See also Tiem Trinh, 665 F.3d 1, 12 (1st Cir. 2011) ("case law makes clear that corroboration of even innocent activity reported in the tip may support a finding of probable cause, and that corroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip.") (internal quotations omitted) (cleaned up).

Third, the information omitted, while not irrelevant, does not meaningfully undermine the substantive information included in the affidavit. "[T]he commission of a past crime does not necessarily undercut a person's veracity." U.S. v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015) (citing U.S. v. Rumney, 867 F.2d 714, 720-21 (1st Cir. 1989). "Even a prior conviction for a crime of dishonesty is not always dispositive of a witness's reliability." Id. (citations omitted). The omitted criminal conviction here, while sounding ominous, was the result of the CW dropping and then stepping on top of drugs he was holding in an attempt to hide them during an ongoing drug possession investigation – a fairly predictable "in the heat of the moment" response from a criminal under active investigation for a drug crime. See Rumney, 867 F.2d 714, 720 (1st Cir. 1989) (informant's "credibility was not undercut merely because

[informant] made predictable denials until the police could produce evidence linking him to the robbery."). With regard to the CW's behavior during the July 31 traffic stop, Agent Burke testified:

> I would go so far as to say that, if someone's being deceptive to law enforcement on a car stop precluded them from providing honest information to me, then I don't think I could probably interview anyone in this courtroom or elsewhere. I just think it's that common a thing that people are stressed on car stops and they say things they don't mean[,] and they just try to, you know, avoid getting in trouble.
> . . .
>
> . . . I think deception on a traffic stop is so common that it didn't affect my assessment of the information he [later] provided, and, again, I just think deception on any traffic stop, if that were such a deal breaker for . . . collecting information from people, that we wouldn't have anybody to talk to. So, when I read that, I didn't really think anything of it. I just thought that's sort of human nature.

The affidavit "made no secret" of the CW's criminality, reporting that the CW had been arrested on two separate warrants for drug offenses, and had provided the information concerning Francis during a post-arrest interview. U.S. v. Belton, 414 F. Supp. 2d 101, 110 (D.N.H. 2006), aff'd, 520 F.3d 80 (1st Cir. 2008) (noting that "despite the omission of certain details of that criminality, the magistrate 'issuing the search warrant would manifestly have been aware that [informant] was not a model citizen" in considering his reliability'") (quoting U.S.

v. Hall, 171 F.3d 1133, 1142 (8th Cir. 1999)) (cleaned up).
Neither the conviction nor the CW's failure to be entirely
forthright with the police during his July 31 stop would have so
significantly diminished the CW's credibility that the
magistrate judge's probable cause determination would have been
different.  See U.S. v. Tanguay, 907 F. Supp. 2d 165, 183-84
(D.N.H. 2012), ("information from dishonest informants may still
provide a basis for probable cause.' It is 'only in the absence
of additional evidence to bolster the informant's credibility or
the reliability of the tip' that 'an informant's criminal past
involving dishonesty is fatal to the reliability of the
informant's information, and his/her testimony cannot support
probable cause.'") (quoting U.S. v. Patayan Soriano, 361 F.3d
494, 506-07 (9th Cir. 2004) and U.S. v. Elliott, 322 F.3d 710,
716 (9th Cir. 2003)) (cleaned up).

      Finally, Special Agent Burke, a ten-year veteran of the
FBI, assessed the significance of the information provided by
the CW based on his own professional experience, skill, and
knowledge.  There is no evidence suggesting that Burke harbored
any doubts at all – let alone serious doubts – about the
veracity of the affidavit, or that he thought that either of the
omitted facts were significant in assessing probable cause.

In sum, even upon a reformed affidavit, there was a fair probability that contraband or evidence of a crime would be found in defendant's car.  Accordingly, defendant's motion to suppress evidence obtained from the search of his vehicle is **DENIED**.

## Motion to Suppress Evidence Obtained During Arrest

Francis argues – and the government concedes – that his arrest, on grounds that he was in violation of his state parole conditions, was not authorized under New Hampshire law. Therefore, Francis says, evidence obtained from his cell phone, which was seized from the bank counter incident to his arrest, and the statements he later made to law enforcement officers in a post-arrest interview, should be suppressed.

Francis was arrested in the bank for a state parole violation, pursuant to N.H. Rev. Stat. Ann. 504-A:4 (failure to inform his parole officer of his change of address).  But, that statute provides that an arrest for a parole violation involving non-criminal conduct requires a warrant issued by a parole board member, and a request from a parole officer if the arrest is by local, or other law enforcement officers.  No warrant or written detention order was issued at the time of Francis's arrest, and

a state parole officer did not request that Francis be arrested.
Accordingly, his arrest was not authorized under state law.

Again, the government concedes that point, but objects to
Francis's motion to suppress on several bases.  First, the
government argues that seizure of the phone did not violate the
Fourth Amendment because Francis was a parolee at the time of
his arrest, and, as a result, had a diminished expectation of
privacy.  Second, the government argues that law enforcement was
entitled to detain Francis while the vehicle warrant was being
executed, and, that Francis would have inevitably been arrested
on probable cause to believe he was engaged in drug dealing
after drugs were discovered in his car shortly thereafter.[6]
Therefore, the government says, the seizure of defendant's phone
was inevitable, and defendant's post-arrest interview would have
inevitably been conducted following his inevitable arrest for
drug possession.  Finally, the government argues that, even if
the seizure of the phone was not incident to a lawful arrest,
the exclusionary rule should not apply because the "unique
circumstances of defendant's arrest and compressed timeline with

---

[6]    Francis was initially detained on the purported parole
violation, until the federal complaint was filed on September 3,
2021, after which he was arrested on federal charges, and
brought into federal custody.

the execution of the vehicle search warrant do not warrant the exclusion of evidence in this case." Govt. Supp. Br. in Support of Obj. at 5. Because the inevitable discovery doctrine applies, the court need not reach the government's additional arguments.

The inevitable discovery doctrine provides that, "evidence that would inevitably have been discovered without reference to the police error or misconduct may be admitted at trial." U.S. v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011) (quotations omitted). "Such evidence is admissible so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." Id. (quotations and citation omitted).

Here, the "lawful means," the already-issued and contemporaneously executed warrant to search the car, were independent of the defendant's arrest on a parole violation inside the bank. As discussed above, the warrant to search the car was valid. At the time of defendant's arrest inside TD Bank, the search of defendant's car had begun in the bank's parking lot. Had defendant not been arrested inside the bank,

he surely would have been arrested just moments later after
drugs were discovered in his car and that information was
communicated to officers in the bank.  Given the events that
unfolded following execution of the warrant, it is difficult to
imagine any circumstance in which Francis's cell phone would not
have been seized, if only to inventory it.  In other words, it
would have "inevitably" been seized moments later.  The cell
phone's contents would likely, as occurred, have been the
subject of an application for an additional search warrant,
which, when issued, would have been executed, leading to the
inevitable discovery of the incriminating information stored on
the phone.

    Finally, application of the inevitable discovery doctrine
in this case would not provide any incentive for future police
misconduct.  The evidence of record makes clear that the
officers who arrested Francis inside the bank honestly, though
mistakenly, believed they were authorized to effect an arrest
based on a clear violation of the terms of Francis's parole
conditions.  And, as mentioned, the officers would have, without
question, arrested Francis moments later when the discovery of
drugs in his car was communicated to them.  See U.S. v. Almeida,
434 F.3d 25, 29 (1st Cir. 2006) (noting that where "officers
would have eventually seized the drugs by arresting Almeida (as

they had planned to do before questioning him), they had little
incentive to try to obtain the crack through unconstitutional
means when a lawful means was readily available.").  As the
government persuasively points out, the circumstances of this
case are unusual and unlikely to serve as an incentive for
police to cut constitutional corners in the future.  The error
in arresting Francis was not an error related to probable cause,
but an error in applying New Hampshire law.

       For these reasons, as well as those argued in the
government's briefing in support of its objection (documents no.
61 and 85), defendant's motion is **DENIED**.

### Conclusion

       Defendant's motion to suppress evidence seized when
executing the search warrant for the white Honda Accord
(document nos. 35 and 73) is **DENIED**.  Defendant's motion to
suppress cell phone evidence and statements resulting from
unconstitutional arrest (document no. 54) is **DENIED**.

       Defendant's motions to suppress the introduction of
evidence gathered by law enforcement during a search of his
apartment on September 2, 2021, (document no. 34), and to
suppress his statements made on September 7, 2021, (document no.
36) are deemed moot.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 3, 2023

cc:   Charles L. Rombeau, AUSA
      Aaron G. Gingrande, AUSA
      Richard Guerriero, Esq.
      U.S. Marshal
      U.S. Probation